UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-61055-Civ-SEITZ
MAGISTRATE JUDGE P.A. WHITE

ROBERT BROWN,                           :

        Petitioner,                     :

v.                                      :          REPORT OF
                                                   MAGISTRATE JUDGE
WALTER A. McNEIL,                       :

        Respondent.                     :
_____

I. Introduction

        Robert Brown, who is presently under the supervision of the Department of Corrections,[1] has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, attacking his conviction and sentence in case number 01-3168, entered in the Seventeenth Judicial Circuit Court for Broward County.

        This cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. § 636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts.

        The Court has before it the petition for writ of habeas corpus, the Respondent's response to an order to show cause and

_____

        [1] Brown was being held at the Dade Correctional Institution at the time he filed the instant petition. According to the Department of Corrections' website, he appears to have been placed on supervised community control. See http://www.dc.state.fl.us/ActiveInmates/detail.asp?Bookmark=25&From=list&SessionID=260867571. Accordingly, he is "in custody" for purposes of this petition. See Coronado v. United States Bd. of Parole, 540 F.2d 216, 217 n. 3 (5th Cir. 1976) (habeas jurisdiction properly attached and petitioner was "in custody" in the district where he was placed under the supervision of a U.S. Probation Officer). He has not filed a notice of change of address with the Court so a copy of this Report will be sent to his last known address.

appendix of exhibits.

## II. Procedural History

Brown was charged with second-degree murder for stabbing John Berrian. [DE# 10, Ex. 1].

Officers responded to a 911 call reporting a possible stabbing with a man was lying motionless in a grassy area in the Sistrunk neighborhood of Fort Lauderdale. The victim was a sometimes-homeless crack user who was dead when police arrived. His body had been dragged over 100 feet from an area used for drug transactions to a more isolated grassy area. A bag with cocaine residue containing some fake crack rocks, and a few dollars were found on the body.

The medical examiner testified the victim sustained five stab wounds. There was a five-inch deep wound to the chest that pierced a lung, a five-inch deep wound to the front of the right thigh that completely severed the femoral artery, a five and a quarter inch wound to the front of the left thigh that injured the left femoral vein, and a wound to the back of each thigh measuring six and a half inches and two and three-eighths inches deep that only penetrated muscle. According to the medical examiner, the wounds to the chest, right femoral artery, and right femoral vein were all potentially fatal. [DE# 10, Ex. 33 at T. 810-11]. It would take a victim with these injuries approximately two to five minutes to bleed out and die. [DE# 10, Ex. 33 at T. 835]. All the stab wounds were consistent with being caused by the same weapon. [DE# 10, Ex. 33 at T. 812]. The victim also sustained unhealed abrasions consistent with being dragged at or near the time of death. [DE# 10, Ex. 33 at T. 812-13].

Bridget Thompson testified she employed the victim in her lawn service business and that she let him stay at her house. She had paid him $60 on the day of the offense. She testified she knew where he kept his belongings and that she never saw a gun. [DE# 10, Ex. 33 at T. 742].

Jerome Singletary sometimes washed Brown's truck and acted as a lookout for Brown's drug sales. [DE# 10, Ex. 33 at T. 870]. He had told officers a few days after the offense that he had overheard Brown arguing with someone, however, Singletary denied making that statement at trial. [DE# 10, Ex. 33 at T. 871-72].

Vernon McWhite also washed Brown's vehicles and sometimes acted as a drug lookout. [DE# 10, Ex. 33 at T. 893]. He was in the Sistrunk area on the night of the offense when he heard Brown call out to him. Brown and another individual were tussling on the ground. He testified he saw a gun so he backed up and left the area. He denied having told police that he saw Brown with a knife in a statement a few days after the offense. [DE# 10, Ex. 33 at T. 903]. The State impeached him with his statement to police and with a 911 tape reporting someone had been stabbed. [DE# 10, Ex. 33 at T. 904, 926].

Jerome Fiddemon testified he knew Brown from the neighborhood and used to buy drugs from him. He was in a secluded area in Sistrunk using drugs when he heard an argument. One man claimed another stole money or something from him and said to give it back or he was going to "fuck him up." [DE# 10, Ex. 33 at T. 1002]. He recognized the voice as Brown. [DE# 10, Ex. 33 at T. 1003]. He left the area and returned about thirty minutes later to find police had arrived and put up yellow tape. [DE# 10, Ex. 33 at T. 1006]. He went to the police station about a week later to report the

argument he overheard because he had heard rumors connecting himself to the stabbing. [DE# 10, Ex. 33 at T. 1006]. He used an alias because he had an outstanding warrant in a separate matter. [DE# 10, Ex. 33 at T. 1007].

Detective Stone testified he and another officer arrested Brown approximately twenty days after the offense when McWhite implicated him. [DE# 10, Ex. 33 at T. 513]. The officers arrested Brown at approximately 7:00 AM and transported him to the station. They placed him in an interview room, introduced themselves and asked if he knew why he was under arrest. He said yes, then said no and that the officers would have to explain why he was there. The officers said they were investigating the murder of John Berrian, that they knew he was involved and would like to hear his side of the story. Brown immediately said he knew this was coming and went into a narrative about how the incident occurred. The officers had not turned on a tape recorder and had not advised Brown of his <u>Miranda</u> rights at that point because they were introducing themselves and determining whether he would cooperate. [DE# 10, Ex. 33 at T. 516]. When Brown finished his narrative, Detective Stone read Brown <u>Miranda</u> warnings from a printed card. This included the warning that "[y]ou have the right to talk to an attorney and to have an attorney present during any questions." [DE# 10, Ex. 33 at T. 517]. Brown stated he understood, chose to waive his rights, and agreed to give a taped statement. The tape was played at trial in its entirety. [DE# 10, Ex. 33 at T. 521].

In the first taped statement, Brown admitted he had been advised of his rights, understood them, and was voluntarily talking to police. Brown explained he was hanging around, talking to a girl when the victim came up to him holding a bag as if to sell him something. The victim pulled out a gun and demanded money. Brown

4

scuffled with the victim and fell to the ground with the victim straddling him. As Brown struggled for the victim's gun, Brown pulled out his four-inch buck knife from its sheath and "hit" the victim in the leg twice. He got free and ran away. He claims he took the victim's gun home and hid it in his house. He gave police permission to recover the gun; officers found a revolver wrapped in a cloth hidden in Brown's home. Brown explained he threw away the knife and his shirt in a dumpster. He denied moving the victim from the location of the stabbing.

Brown agreed to provide a second taped statement at approximately 7:00 PM, which was also played for the jury. [DE# 10, Ex. 33 at T. 564]. Brown again confirmed he understood his rights and that the statement was voluntary. This time, he admitted he sells crack at night and that he was selling crack when the victim approached him and tried to rob him with a gun.

Defense counsel called Geneva James, who testified she was using drugs with the victim in a rooming house on the night of the offense. They used $45 worth of crack that the victim paid for then he left to find more drugs. He never returned.

Counsel called a number of witnesses to testify the victim had a reputation for violence. James testified she heard from people including Fay Wilson that the victim "jacked" people for drugs. [DE# 10, Ex. 33 at T. 1082]. Ronnie Rolax testified McWhite had told him about the scuffle he witnesses involving a gun. [DE# 10, Ex. 33 at T. 1141]. The defense re-called McWhite, who claimed he did not hear any argument over money. [DE# 10, Ex. 33 at T. 1147]. Lee Berry testified he had seen the victim on a prior occasion with

a 9mm handgun.[2] [DE# 10, Ex. 33 at T. 1151]. He testified the victim had the reputation of going around robbing people to support his drug habit. [DE# 10, Ex. 33 at T. 1156]. He claimed Fiddemon told him to corroborate his version of events so they could split the reward money. [DE# 10, Ex. 33 at T. 1160].

A defense medical expert testified the victim's wounds were not immediately incapacitating, that his lack of defensive wounds indicated he might have been holding something like a gun, and that he could have been walking around for five or ten minutes after receiving the wounds to his legs. [DE# 10, Ex. 33 at T. 1199]. The expert testified the victim could have received stabs to the legs and run away. Five to ten minutes later he could have been dragged to another location and stabbed in the chest. [DE# 10, Ex. 33 at T. 1211]. He testified that only the stab to the femoral artery was fatal. [DE# 10, Ex. 33 at T. 1181].

The defense established there was a $1000 reward for information relating to the victim's stabbing. [DE# 10, Ex. 33 at T. 1072].

On rebuttal, Detective Stone testified nobody received the $1000 reward. [DE# 10, Ex. 33 at T. 1260].

In closing, the prosecutor argued Brown stabbed the victim over a drug debt. [DE# 10, Ex. 33 at T. 1305-07]. The prosecutor argued the defense witnesses' testimony regarding the victim's reputation was not credible because they were Brown's friends and employees from the Sistrunk neighborhood who were either loyal to him or intimidated by him:

---

[2] The gun recovered from Brown's home that he allegedly wrestled away from the victim, was a revolver.

[Closing argument by Mr. Volz]: Loyalty, money, and then in this case, drugs. In this case, drugs. In the Sistrunk area.

Do we believe those people? Absolutely not. Absolutely not.

They're sticking up for their boy. He's looking at some trouble, and they're going to come in here and they are going to testify.

[DE# 10, Ex. 33 at T. 1330-31].

Let's talk about Mr. Singletary. He works for the defendant as a lookout. Washes his cars. His truck. He heard an argument, but he can't recognize anything. So – even if he knows something, he is not going to say anything in here. That's another one of his boys. The Sistrunk crew.

[DE# 10, Ex. 33 at T. 1321].

Counsel also noted some witnesses had changed their stories after talking to Brown after the offense. [DE# 10, Ex. 33 at T. 1318-21] (noting the change between McWhite's 911 call reporting a stabbing and trial testimony reporting he saw a gun, after Brown got his "grips on him"); [DE# 10, Ex. 33 at 1319-20] (noting Geneva James suddenly knew the victim's reputation after she "conveniently" ran into Brown after the offense); [DE# 10, Ex. 33 at 1321] (Ronnie Rolax had a "convenient" conversation with McWhite after the offense); [DE# 10, Ex. 33 at 1323] (Lee Berry, one of the "Sistrunk boys," "can't even get his story straight" about whether the gun he alleged to have seen was a revolver or a 9mm and testified the victim had a reputation of robbing people for money).

Defense counsel argued the victim came up to Brown to rob him

at gunpoint, knocked Brown down and Brown defended himself by stabbing the victim in the legs. The two parted and an unknown individual attacked the victim, dragging him into the field and stabbing him in the chest.

On rebuttal closing, counsel argued the testimony revealed the stabbing was not self-defense but was a drug-motivated killing:

> [The victim] is an addict. He already owes [Brown money. He already owes him money. "This is all you have got? This is all you have got? You're doing this again? Not to me. Not to me. I'm going to show you who's boss. I am the boss of Sistrunk. I am the man. I am the dealer. I am the one that dictates what goes on. And I'm here to tell you this is what you are going to get."

[DE# 10, Ex. 33 at T. 1383-84].

The jury found Brown guilty of the lesser offense of manslaughter. [DE# 10, Ex. 2]. The court adjudicated him guilty and sentenced him to thirteen years in prison. [DE# 10, Ex. 4-5]. On direct appeal, he argued the trial court erred in denying his motions for judgment of acquittal because the case relied solely on circumstantial evidence which was inconsistent with Brown's reasonable self-defense hypothesis of innocence. [DE# 10, Ex. 7]. The Fourth District Court of Appeal per curiam affirmed on December 1, 2004. Brown v. State, 888 So. 2d 646 (Fla. 4th DCA 2004) (4D03-434).

On August 4, 2005, Brown filed a Rule 3.850 motion for post-conviction relief in which he argued (1) counsel was ineffective for failing to: (i) move to suppress incriminating statements made prior to Miranda warnings; (ii) failing to object to the jury

instruction on culpable negligence; (iii) failing to file a motion to present reverse <u>Williams</u> rule evidence that McWhite was knowledgeable about anatomy due to his college education in psychology, demonstrating he was the actual murderer; (iv) failing to object to prosecutorial misconduct during closing arguments when the State told the jury to throw out the instructions on self-defense; (v) failing to call Fay Wilson at trial, who would have testified regarding the victim's reputation in the community for robbing drug dealers; (vi) failing to object when the prosecutor stated Brown had the propensity to commit criminal acts, was leader of Sistrunk gang, controlled witnesses and procured perjured testimony as gang leader; (2) the State engaged in prosecutorial misconduct by: (i) knowingly presenting perjured testimony through Fiddemon and (ii) telling the jury witnesses were not believable, made up scenarios that were unsupported by the evidence, and misrepresented the evidence and testimony, to which defense counsel in large part failed to object; (3) the trial court abused its discretion by failing to read the complete instruction on manslaughter by failing to instruct on culpable negligence. [DE# 13]. The trial court denied relief for the reasons set forth in the State's response and denied rehearing. [DE# 10, Ex. 15, 17]. The Fourth District reversed in part and remanded for an evidentiary hearing only on Brown's claim of newly discovered evidence regarding Fiddemon's testimony. <u>Brown v. State</u>, 960 So. 2d 890 (Fla. 4th DCA 2007) (4D06-4472).

At the evidentiary hearing on Fiddemon's alleged recantation, defense counsel explained the claim was meritless. The Rule 3.850 claim of newly discovered evidence relating to Fiddemon was based on an affidavit Fiddemon had signed while in prison serving a sentence in an unrelated case. In it, he apparently retracted his trial testimony implicating Brown in the victim's stabbing. Counsel

deposed Fiddemon in preparation for the Rule 3.850 evidentiary
hearing. At that time, Fiddemon had been released from prison. He
explained the affidavit was not true and he had only signed it
because he was being housed in the same prison quad as Brown at the
time and felt pressured to cooperate. Counsel explained there was
no basis for going forward with the Rule 3.850 evidentiary hearing
in light of Fiddemon's deposition. The court agreed and asked Brown
whether he understood and gave him the choice of either withdrawing
his claim or having it denied by the court. Brown stated he
understood, declined to withdraw the claim and acknowledged the
court would be denying relief. [DE# 10, Ex. 25]. The trial court
denied the motion. [DE# 10, Ex. 26]. The Fourth District per curiam
affirmed without requiring an appearance from the State. Brown v.
State, 998 So. 2d 621 (Fla. 4th DCA 2008) (4D08-2993). The mandate
issued on February 20, 2009. [DE# 10, Ex. 31].

Brown filed a Rule 3.853 motion for DNA evidence examination
on November 27, 2006, and subsequently filed motions to amend and
rule on the motion. [DE# 10, Ex. 32]. The State courts denied
relief. [DE# 10, Ex. 32].[3]

Brown filed the instant petition on July 15, 2009.[4] He argues
(renumbered): (1) counsel was ineffective for failing to have the
confession suppressed because (A) officers questioned Brown for
several hours without administering Miranda warnings and (B) the
warnings officers finally provided failed to advise Brown of the

---

[3] The Court takes judicial notice of the records pertaining to Brown
maintained by the clerk of the Fourth District Court of Appeal located at
http://199.242.69.70/pls/ds/ds_docket?p_caseyear=2009&p_casenumber=1603&psCour
t=4&psSearchType=. See Fed. R. Ev. 201.

[4] The Eleventh Circuit recognizes the "mailbox" rule in connection with
the filing of a prisoner's petition for writ of habeas corpus. Adams v. United
States, 173 F.3d 1339 (11th Cir. 1999) (prisoner's pleading is deemed filed
when executed and delivered to prison authorities for mailing).

right to have counsel present before and during questioning; (2) the prosecutor's inflammatory comments that were not supported by the evidence constituted fundamental error requiring a new trial; (3) conviction obtained through the use of perjured and recanted testimony from Fiddemon violated due process and denied Brown a fair trial under <u>Giglio</u>;[5] (4)(A) counsel was ineffective for failing to call exculpatory witnesses and (B) the trial court deprived Brown due process by denying relief without an evidentiary hearing; and (5) the trial court abused its discretion by denying Brown's motion for judgment of acquittal.

### III. Statute of Limitations & Exhaustion

The Respondent concedes the instant petition was timely filed and the claims have been exhausted in State court.

### IV. Standard of Review

A prisoner in state custody may not be granted a writ of habeas corpus for any claim that was adjudicated on the merits in state court unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented" to the State court. 28 U.S.C. § 2254(d)(1), (2); <u>see</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000); <u>Fugate v. Head</u>, 261 F.3d 1206, 1215-16 (11th Cir. 2001).

A state court decision is "contrary to" or an "unreasonable application of" the Supreme Court's clearly established precedent within the meaning of § 2254(d)(1) only if the state court applies

---

[5] <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

a rule that contradicts the governing law as set forth in Supreme Court case law, or if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. Brown v. Payton, 544 U.S. 133, 141 (2005); Williams, 529 U.S. at 405-06. In the habeas context, clearly established federal law refers to the holdings of the Supreme Court's decisions as of the time of the relevant state-court decision. Hall v. Head, 310 F.3d 683, 690 (11th Cir. 2002) (citing Williams, 529 U.S. at 412). However, in adjudicating a petitioner's claim, the state court does not need to cite Supreme Court decisions and the state court need not even be aware of the Supreme Court cases. See Early v. Packer, 537 U.S. 3, 8 (2002); Parker v. Sec'y, Dep't of Corr., 331 F.3d 764, 775-76 (11th Cir. 2003).

So long as neither the reasoning nor the result of the state court decision contradicts Supreme Court decisions, the state court's decision will not be disturbed. Id. Further, a federal court must presume the correctness of the state court's factual findings unless the petitioner overcomes them by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

In the instant case, Brown seeks habeas relief based on ineffective assistance of counsel. The United States Supreme Court clearly established the law governing such claims in Strickland v. Washington, 466 U.S. 668 (1984). Strickland requires a criminal defendant to show that: (1) counsel's performance was deficient and (2) the deficiency prejudiced him. Id. at 690. As to the first prong, deficient performance means performance outside the wide range of professionally competent assistance. Id. The judiciary's scrutiny of counsel's performance is highly deferential. Id. at

12

689. As to the second prong, a defendant establishes prejudice by showing that, but for counsel's deficient performance, there is a reasonable probability the outcome of the proceedings would have been different. Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. Id. A defendant must satisfy both the deficiency and prejudice prongs set forth in Strickland to obtain relief on an ineffective assistance of counsel claim. Failure to establish either prong is fatal and makes it unnecessary to consider the other. Strickland, 466 U.S. at 697.

## V. Discussion

(1)  Ineffective Assistance: Miranda

Brown argues counsel was ineffective for failing to suppress his statements to police because: (A) officers questioned him for several hours without administering Miranda warnings, and (B)the warnings officers finally provided failed to advise Brown of the right to have counsel present before and during questioning.

(A) First, counsel was not ineffective for failing to have his statements to police suppressed due to the delay between Brown's arrest and Miranda warnings.

Miranda warnings need to be administered after a person is taken into custody or their freedom has been significantly restrained. Miranda v. Arizona, 384 U.S. at 478. Miranda does not hold, however, "that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Oregon v. Elstad, 470 U.S. 298, 309 (1985). On the other

13

hand, suppression of a post-Miranda confession is required if "the two-step interrogation technique [is] used in a calculated way to undermine the Miranda warning." Missouri v. Siebert, 542 U.S. 600, 622 (2004). This exception applies when the two-step technique is used as a matter of policy to purposefully withhold Miranda warnings while a suspect in custody is being interrogated in order to obtain a full confession first, then provide him warnings and get him to re-confess. See United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006). Whether the "question first" tactic has been used depends on the totality of the circumstances including the timing, setting and completeness of the pre-warning interrogation, continuity of police personnel and overlapping content of the pre- and post-warning statements. Id.

In the instant case, no "question first" tactic is apparent. Officers introduced themselves, asked Brown if he knew why he was there, and explained it involved the victim's death. Without being questioned, Brown said he knew this was coming and launched into a narrative about the offense. Officers then provided Miranda warnings and asked whether Brown would participate in a taped interview. The circumstances indicate no "question first" tactic occurred. The timing indicates Brown launched into a pre-Miranda narrative during the officers' introduction immediately preceding the Miranda warnings. Officers did not engage in a complete interrogation at that time - they simply listened while Brown engaged in a narrative. Finally, the taped statement was much lengthier, involved questions by police, and was much more detailed than the outline of events Brown provided in his initial narrative. Under these circumstances, the unwarned narrative did not taint Brown's knowing and voluntary Miranda waiver and subsequent taped statements. See Street, 472 F.3d at 1314 (no Siebert exception where officers gave the defendant partial warnings up front,

14

questioned him only briefly and generally before the full warnings; incriminating statements following full warning were properly admitted). No basis for suppressing the statements is evident, accordingly counsel was not deficient and no prejudice resulted.

(B) Nor is counsel ineffective for failing to have the statements suppressed due to allegedly defective Miranda warnings.

Brown's allegation the warnings failed to advise him of the right to have an attorney present before and during questioning is refuted by the record. Detective Stone testified at trial that he read Brown his rights before the first taped statement. He advised Brown "You have the right to talk to an attorney and to have an attorney present during any questions." [DE# 10, Ex. 33 at T. 517]. Brown acknowledged on tape that he had been advised of his rights. [DE# 10, Ex. 33 at T. 521]. Accordingly, this claim is refuted by the record and does not warrant habeas relief. See Mason v. Allen, 605 F. 3d 1114 (11th Cir. 2010) (habeas relief unwarranted where claim the state filed to advise defendant of his Miranda rights was refuted by the record).

Moreover, to the extent Brown attempts to argue the warnings were defective under Roberts v. State, 874 So. 2d 1225 (Fla. 4th DCA 2004), this claim likewise fails. In Roberts, the Fourth District issued an opinion invalidating Broward County's standard Miranda rights form because it only advised of the right to have an attorney before, but not during, questioning. The opinion issued on May 26, 2004, and the court denied rehearing on July 2, 2004. Brown provided his statements to police on February 23, 2001, and the case was tried in October, 2002, several years before Roberts was issued.

An attorney's failure to anticipate a change in the law does not constitute ineffective assistance of counsel under Strickland. See United States v. Ardley, 273 F.3d 991, 993 (11th Cir. 2001); Funchess v. Wainwright, 772 F.2d 683, 691 (11th Cir. 1985); see also Ulcena v. State, 925 So. 2d 346 (Fla. 4th DCA 2006) (Roberts does not apply retroactively to cases on collateral review). Trial counsel cannot be faulted for failing to foresee the standard rights waiver form would be invalidated several years after Brown's statements to police. Therefore, even if officers had provided defective warnings, counsel's failure to object was reasonable under the professional norms prevailing at that time. See, e.g., Stancle v. McNeil, 2009 WL 2948394 (S.D. Fla. Sept. 14, 2009); James v. McNeil, 2008 WL 2594088 (S.D. Fla. June 27, 2008). Therefore, counsel was not constitutionally deficient for failing to raise any Miranda form deficiency at the suppression hearing and trial.

The State court's denial of relief is not contrary to or an unreasonable application of Strickland under these circumstances.

(2)  Prosecutorial Misconduct

Brown argues the prosecutor's stated that "The Petitioner was the leader of a notorious street gang who call themselves 'the Sistrunk Gang'" was unsupported by the evidence and impugned Brown's character.

"[T]he bar for granting habeas based on prosecutorial misconduct is a high one." Land v. Allen, 573 F.3d 1211 (11th Cir. 2009). Prosecutorial misconduct can only be a basis for relief if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Brooks v. Francis, 716 F.2d 780, 788 (11th Cir.

1983). To determine whether a prosecutor's arguments are sufficiently egregious to result in the denial of due process, the court considers the statements in the context of the entire proceeding, including: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. Romine v. Head, 253 F.3d 1349, 1369-70 (11th Cir. 2001).

As a preliminary matter, Brown's claim that the prosecutor argued he is the boss of the Sistrunk street gang is factually inaccurate. The transcript page which Brown cites contains closing argument that Brown's friends from the Sistrunk neighborhood were not credible because they were loyal to him and tried to protect him at trial. [DE# 10, Ex. 33 at T. 1321]. The prosecutor made similar comments to explain why other defense witnesses from the neighborhood were biased in Brown's favor and were not credible. See [DE# 10, Ex. 33 at T. 1321] (regarding Ronnie Rolax and Vernon McWhite) [DE# 10, Ex. 33 at T. 1323] (regarding Lee Berry); see generally [DE# 10, Ex. 33 at T. 1330-31]. On rebuttal closing, the prosecutor referred to Brown as the "boss of Sistrunk." This comment referred to Brown's motive to stab the victim, i.e, as retaliation for failing to pay a drug debt. See [DE# 10, Ex. 33 at T. 1383-84].

The foregoing comments were based on reasonable inferences from the evidence. Brown admitted in his second taped statement that he was selling drugs on the night of the offense. McWhite and Singletary testified Brown periodically employed them as lookouts for his drug sales. Defense witness Geneva James testified that the victim was smoking crack immediately before the offense and went out to get more drugs when he disappeared. The victim was found

17

dead with a few dollars in his wallet and a bag of fake crack in his pocket. Fiddemon testified he heard Brown arguing with someone about money in the area Brown conducted his drug sales about thirty minutes before police found the victim's body. Finally, the State impeached Singletary, McWhite and James with prior inconsistent statements about the circumstances surrounding the offense and the victim's alleged reputation for committing robberies to support his drug habit.

Based on the foregoing, it was fair to argue that Brown's friends from the neighborhood were not credible and that Brown stabbed the victim to show him who was boss in retaliation for a drug debt. To the extent these comments may have exceeded the bounds of propriety, they cannot be said to have deprived Brown a fair trial in light of his own admissions he was a drug dealer in the Sistrunk neighborhood. Based on the foregoing, the State court's denial of this claim is not contrary to or an unreasonable application of clearly established federal law.

(3)  <u>Giglio Violation</u>

Brown argues his conviction was obtained through the use of perjured and recanted testimony from Fiddemon, which violated due process and denied him a fair trial. He complains the only evidence that Brown developed the intent to harm the victim was Fiddemon's testimony which he recanted in a sworn affidavit.

A <u>Giglio</u> violation occurs where undisclosed evidence reveals the prosecution knowingly made false statements or introduced or allowed trial testimony that it knew or should have known was false. <u>Giglio v. United States</u>, 405 U.S. 150, 153 (1972); <u>Smith v. Sec'y, Dep't of Corr.</u>, 572 F.3d 1327, 1334-35 (11th Cir. 2009). To prevail on a <u>Giglio</u> claim, a petitioner must establish that: (1)

the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material. Ford v. Hall, 546 F.3d 1326, 1331-32 (11th Cir. 2008). A defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); see Ford, 546 F.3d at 1332 (harmless error standard).

Brown has failed to establish a Giglio violation because there is no evidence Fiddemon's testimony was false. Defense counsel explained at Brown's Rule 3.850 hearing that Fiddemon's affidavit was procured under "disturbing" circumstances while Fiddemon and Brown were being housed in the same prison quad approximately five years after trial. Fiddemon testified in a deposition that the affidavit was untrue and his trial testimony was correct. Counsel concluded there was no factual basis for proceeding with the evidentiary hearing because Fiddemon's testimony would not have been helpful to Brown. The trial court reasonably concluded, based on counsel's concession, that no newly discovered evidence existed in regards to Fiddemon's trial testimony. The court's denial of the claim following an evidentiary hearing at which no exculpatory evidence was presented is not contrary to or an unreasonable application of Giglio.

(4)(A) Ineffective Assistance: Failure to Call Witness

Brown argues counsel was ineffective for failing to call an exculpatory witness who was available at trial.[6]

"Which witnesses, if any, to call, and when to call them, is

---

[6] Although Brown does not identify the witness in his petition, the Court assumes Brown refers to Fay Wilson, who was the subject of his Rule 3.850 claim.

the epitome of a strategic decision," and it is one that the courts will seldom, if ever, second guess. Rhode v. Hall, 582 F.3d 1273 (11th Cir. 2009) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995)). Claims concerning uncalled witnesses "impose a heavy showing since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative." United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980); West v. Sec'y, Dep't of Corr., 151 Fed. Appx. 820 (11th Cir. 2005). A petitioner must show there is a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have located the witness by using a reasonably diligent effort. Elledge v. Dugger, 823 F.2d 1439, 1446-48, vacated on other grounds, 833 F.2d 250 (11th Cir. 1987). Counsel cannot be deemed deficient for failing to call an unavailable witness. Elledge, 823 F.2d at 1446-48. Further, it is well-settled that "a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 (11th Cir. 2002); see Parker v. Allen, 565 F.3d 1258 (11th Cir. 2009) (same).

In his Rule 3.850 motion, Brown argued counsel failed to call Fay Wilson at trial to testify regarding the victim's reputation in the community for robbing drug dealers. This testimony would have been cumulative of testimony from Geneva Jones and Lee Berry. [DE# 10, Ex. 33 at T. 1092-93, 1156]. Indeed, Jones testified that one of the people upon whom her own opinion of the victim's reputation was based was Fay Wilson. Calling Wilson to provide that same testimony would have been cumulative and cannot support relief. See Van Poyck, 290 F.3d at 1324 n.7 ("A petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely

cumulative."). Accordingly, the State court's denial of this claim is not contrary to or an unreasonable application of <u>Strickland</u>.

(B)   <u>Evidentiary Hearing</u>

Brown also argues the trial court violated due process by denying his Rule 3.850 claim without an evidentiary hearing. This claim fails to raise a federal constitutional issue on which relief can be granted.

Federal habeas relief is available only to correct constitutional injury. 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a); <u>see</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) (holding errors that do not infringe a defendant's constitutional rights provide no basis for federal habeas corpus relief); <u>Barclay v. Florida</u>, 463 U.S. 939, 958-59 (1983) ("[m]ere errors of state law are not the concern of this court ... unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution.") (citations omitted). Questions of state law and procedure "rarely raise issues of federal constitutional significance, because '[a] state's interpretation of its own laws provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.'" <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1560 (11th Cir. 1991) (quoting <u>Carrizales v. Wainwright</u>, 699 F.2d 1053, 1053-54 (11th Cir. 1983)). Habeas review of a state law claim is therefore precluded if no due process violations or facts indicating such violations are alleged. This limitation is of equal force when a petition involving state law issues is "couched in terms of equal protection and due process." <u>Branan v. Booth</u>, 861 F.2d 1507, 1508 (11th Cir. 1988) (quoting <u>Willeford v. Estelle</u>, 538 F.2d 1194, 1198 (5th Cir. 1976)). Further, "defects in state collateral proceedings do not provide a basis for federal habeas relief." <u>Carroll v. Sec'y, Dep't of Corr.</u>,

574 F.3d 1354, 1365 (11th Cir. 2009).

Brown's argument the trial court erred by denying his claim without an evidentiary hearing merely raises an infirmity in State post-conviction review. Accordingly, the trial court's summary denial of his claim does not warrant federal habeas relief. See Carroll, 574 F.3d at 1365 (rejecting claim that state court violated due process by summarily denying Rule 3.850 claim); see, e.g., Roberts v. McDonough, 2008 WL 2782814 (S.D. Fla. July 16, 2008).

(5)  Judgment of Acquittal

Brown argues the trial court abused its discretion by denying his motion for judgment of acquittal. Specifically, he claims the court erroneously rejected his reasonable hypothesis of innocence that he justifiably used deadly force in self-defense against the commission of a forcible felony.

The trial court's denial of a motion for judgment of acquittal ordinarily presents a state law claim, not a claim of constitutional dimension. See Jackson v. Virginia, 443 U.S. 307, 316-19 (1979); Buckner v. State, 714 So. 2d 384 (Fla. 1998) (under Florida law, motion for judgment of acquittal should be denied if the jury could infer guilt from competent evidence viewed in the light most favorable to the state). It would only be a claim of constitutional dimension to the extent that Petitioner claims there was insufficient evidence to support his conviction and there was a violation of due process of law as a result of this deficiency.

The test in federal habeas cases for claims of insufficient evidence is whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to justify any

rational fact finder in finding the petitioner guilty beyond a reasonable doubt. <u>Jackson</u>, 443 U.S. at 316-19; <u>Fallada v. Dugger</u>, 819 F.2d 1564, 1570 (11th Cir. 1987); <u>Martin v. Alabama</u>, 730 F.2d 721, 724 (11th Cir. 1984). The <u>Jackson</u> standard applies to direct and circumstantial evidence. <u>See</u> <u>Jackson</u>, 443 U.S. at 320; <u>United States v. Peddle</u>, 821 F.2d 1521, 1525 (11th Cir. 1987). The fact that the evidence gives some support to the defendant's theory of innocence does not warrant habeas relief. <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1143 (11th Cir. 1987). It is unnecessary for the evidence to exclude every reasonable hypothesis except guilt. <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954). Similarly, in Florida, the test for sufficiency of the evidence is whether a "rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Melendez v. State</u>, 498 So. 2d 1258, 1261 (Fla. 1986). In a circumstantial evidence case, a motion for judgment of acquittal is granted if the state failed to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt. <u>State v. Law</u>, 559 So. 2d 187, 188 (Fla. 1989).

In the instant case, the evidence of Brown's guilt consists of more than circumstantial evidence. He admitted he scuffled with the victim, pulled out his knife, and stabbed the victim in the legs two times. Two of the stab wounds to the victim's legs severed his right femoral artery and injured his left femoral vein and, according to the medical examiner, both wounds were potentially fatal. <u>See</u> <u>Larkins v. State</u>, 655 So. 2d 95 (Fla. 1995) (noting eyewitness testimony is direct evidence of guilt); <u>State v. Ling</u>, 906 So. 2d 1231 (Fla. 1st DCA 2005) (holding the defendant's admission to police is direct evidence of guilt). Further, Fiddemon testified he heard Brown arguing with someone, demanding money, and making threats about thirty minutes before the victim's body was found. Drag marks led from that area to the grassy area where

police discovered the victim's body. The foregoing is direct evidence that Brown stabbed and killed the victim during a dispute and not in defense to an armed robbery attempt.

Even if the case could be characterized as consisting of only circumstantial evidence, the evidence was more than sufficient to sustain the manslaughter conviction. Florida law defines manslaughter as:

> The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter....

§ 782.07(1), Fla. Stat.

Florida addresses the use of deadly force in self-defense as follows:

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has not duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force in he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.

§ 776.013(3), Fla. Stat.

"Deadly force" is defined as "force that is likely to cause death or great bodily harm...." § 776.06(1), Fla. Stat. Robbery is

24

a "forcible felony." § 776.08, Fla. Stat.

There was competent substantial evidence from which a jury could have reasonable concluded Brown stabbed and killed the victim without lawful justification or through culpable negligence. Further, the jury chose to reject the defense theory that Brown was defending himself from an attempted armed robbery. Therefore, the State court's rejection of this claim on direct appeal is not contrary to or an unreasonable application of clearly established federal law.

Based upon the foregoing, it is recommended that this petition for writ of habeas corpus be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

SIGNED this 12th day of July, 2010.

                                    _____
                                    UNITED STATES MAGISTRATE JUDGE

cc:   Robert Brown, pro se
      DC# 052097
      Dade Correctional Institution
      19000 SW 377 Street
      Florida City, FL 33034


      Melanie Dale Surber, AAG
      Office of the Attorney General
      1515 North Flagler Drive
      Suite 900
      West Palm Beach, FL 33401-2299